**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>             Plaintiff-Applicant, <br><br>     - against - <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br><br>         Defendants. | Adv. Pro. No. 08-01789 (BRL) <br> SIPA LIQUIDATION <br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>         Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>         Plaintiff, <br><br>     - against - <br><br> EPIC VENTURES, LLC, <br><br> ERIC P. STEIN, <br><br>         Defendants. | Adv. Pro. No. 10-04466 (BRL) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE

SNR DENTON US LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10016
Telephone: 212 768-6700
Facsimile:  212 768-6800

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

   I.   WITHDRAWAL OF THE REFERENCE OF THESE CASES IS MANDATORY ....... 4

     A.  There is Ample Precedent For Withdrawal of the Reference of This Case ................. 5

     B.  Withdrawal Of The Reference Is Necessary The Bankruptcy Court Lacks Constitutional Authority To Render A Final Decision In The Adversary Proceedings ..................................................................................................... 6

   II.  THE TRUSTEE'S ACTIONS EXCEED THE LIMITS OF HIS AUTHORITY ................. 8

     A.  The Adversary Proceedings Are Not Consistent With SIPA ............................... 8

     B.  SIPA Imposes Limits on the Trustee's Avoidance Powers ................................. 9

     C.  There Is No Precedent for The Trustee's Actions Against Innocent Customers .............. 11

   III.  INTERPRETATION OF SIPA AND OTHER SECURITIES LAWS IS NECESSARY TO DETERMINE THAT WITHDRAWALS DISCHARGED ANTECEDENT DEBT FROM A BROKER TO ITS CUSTOMERS ...................................................... 12

   IV.  CONSIDERATION OF SECTION 546(E) OF THE BANKRUPTCY CODE AND SIPC REQUIRES WITHDRAWAL OF THE REFERENCE ......................................... 15

CONCLUSION ....................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Freight Sys. v. ICC (In re American Freight Sys.)*,
   150 B.R. 790 (D. Kan. 1993)..............................................................................6

*Bear, Stearns Sec. Corp. v. Gredd*,
   No. 01 CIV 4379, 2001 WL 840187 (S.D.N.Y. July 25, 2001)....................................5, 14

*Boston Trading Group, Inc. v. Burnazos*,
   835 F.2d 1504 (1st Cir. 1987)..........................................................................13

*City of New York v. Exxon Corp.*,
   932 F.2d 1020 (2d Cir. 1991) ...........................................................................5

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*
   *(In re Enron Creditors Recovery Corp.)*,
   Case No. 09-5122, 2011 U.S. App. Lexis 13177
   (2d Cir. June 28, 2011) ..................................................................................16

*Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*,
   No. 04 Civ. 8177, 2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) .................................5

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989)...................................................................................2, 7

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ............................................................................13

*Hill v. Spencer S&L Ass'n*,
   83 B.R. 880 (D.N.J. 1988) ............................................................................11

*In re Bayou Group, LLC*,
   439 B.R. 284 (S.D.N.Y. 2010).........................................................................12

*In re Bernard L. Madoff Inv. Sec. LLC*,
   No. 10-2378, 2011 U.S. App. LEXIS 16884 (2d Cir. Aug. 16, 2011) ............................15

*In re Bevill, Bresler & Schulman, Inc.*,
   94 B.R. 817 (D.N.J. 1989) ............................................................................10

*In re Boston Generating, LLC*,
   10 Civ. 6528 (DLC), 10 Civ. 7208 (DLC), 2010 U.S. Dist. LEXIS 116073 (S.D.N.Y.
   Nov. 1, 2010) ..........................................................................................6

*In re Carrozella & Richardson*,
   286 B.R. 480 (Bankr. D. Conn. 2010)..................................................................14

*In re Chateaugay Corp.*,
   86 B.R. 33 (S.D.N.Y. 1987) .......................................................................................4

*In re Contemporary Lithographers, Inc.*,
   127 B.R. 122 (M.D.N.C. 1991) ...............................................................................14

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) .....................................................................12

*In re Resorts Intern., Inc.*,
   181 F.3d 505 (3ʳᵈ Cir. 1999) ...................................................................................16

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005) ......................................................................................13

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
   263 B.R. 406 (S.D.N.Y. 2001)............................................................................11, 12

*Lustig v. Weisz & Assocs.*
   *(In re Unified Commercial Capital)*, 2002 WL 32500567 (W.D.N.Y. June 21,
   2002) .......................................................................................................................14

*Northern Pipeline Constr. Co v. Marathon Pipeline Co.*,
   458 U.S.50 (1982)..................................................................................................2, 7

*Picard v. HSBC Bank PLC*,
   11 Civ. 763 (JSR), 2011 U.S. Dist. LEXIS 44126
   (S.D.N.Y. Apr. 25, 2011)........................................................................................4, 5

*Picard v. JP Morgan Chase & Co.*,
   11 Civ. 0913, 2011 U.S. Dist. LEXIS 57645
   (S.D.N.Y. May 23, 2011).........................................................................................5, 6

*Picard v. Taylor (In re Park S. Sec., LLC)*,
   326 B.R. 505 (Bankr. S.D.N.Y. 2005) .....................................................................11

*Shugrue v. Air Line Pilots Ass'n Int'l*,
   922 F.2d 984 (2d Cir. 1990) ......................................................................................5

*Stern v. Marshall*,
   131 S.Ct.2594 (2011)..........................................................................................2, 6, 7

*Trefny v. Bear Stearns Sec. Corp.*,
   243 B.R. 300 (S.D. Tex. 1999) .................................................................................10

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*,
   191 A.D. 2d 86, 599 N.Y.S. 2d 816 (1st Dep't 1993).................................................13

**RULES & STATUTES**

NASD Rule 2340 ................................................................................................................14

NYSE Rule 409 ................................................................................................................14

11 U.S.C. §105 ..................................................................................................................6

11 U.S.C. §105(a) ..............................................................................................................3

11 U.S.C. §544 ...............................................................................................................3, 4

11 U.S.C. §546(e) ..........................................................................................1, 11, 15, 16

11 U.S.C. §547 ................................................................................................................10

11 U.S.C. §547(b)(1) ......................................................................................................10

11 U.S.C. §548 ..................................................................................................................3

11 U.S.C. §548(a)(1)(A) .................................................................................................16

11 U.S.C. §548(c) ............................................................................................................12

11 U.S.C. §548(d)(2)(A) .................................................................................................12

11 U.S.C. §550(a) ..............................................................................................................3

11 U.S.C. §551 ..................................................................................................................4

11 U.S.C. §1142 ................................................................................................................6

15 U.S.C. §78-1(a) ............................................................................................................9

15 U.S.C. §78eee(3)(B) .....................................................................................................8

15 U.S.C. §78fff(a)(1) .......................................................................................................8

15 U.S.C. §78fff-1(a) ....................................................................................................3, 9

15 U.S.C. §78fff-1(b) ........................................................................................................8

15 U.S.C. §78fff-1(b)(1) ...................................................................................................9

15 U.S.C. §78fff-2(c)(3) .....................................................................................3, 8, 9, 10

15 U.S.C. §78fff(b) ........................................................................................................3, 8

17 C.F.R. §240.10b-10 ...............................................................................................13, 14

28 U.S.C. §157(b)(2)(C) ....................................................................................................7

28 U.S.C. §157(d) .................................................................................................1, 4, 5, 6

N.Y. DCD. LAW §270 .................................................................................................4

N.Y. DCD. LAW §272 ...............................................................................................12

N.Y. DCD. LAW §272(a) ...........................................................................................13

**OTHER AUTHORITIES**

Confirmation of Transactions,
   59 Fed. Reg. 59,612, 59,613 (Nov. 17, 1994) ...................................................... 14

H.R. Rep No. 91-1613, pp. 2-4 (1970) .........................................................................9

S. Rep. No. 91-1218, pp. 2-4 (1970) ............................................................................9

Defendants in the above-captioned adversary proceeding respectfully submit this memorandum of law support of this motion, pursuant to 28 U.S.C. §157(d), to withdraw from the Bankruptcy Court the reference of the adversary proceeding brought against the Defendants by the trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS").

## PRELIMINARY STATEMENT

On or before December 10, 2010, the Trustee filed almost 1000 virtually identical lawsuits against customers of BLMIS, including the Defendants, who withdrew money from their brokerage accounts or, as subsequent transferees, received distributions from another individual or entity that received money from a BLMIS account without knowledge of the fraud on the part of Bernard Madoff.  Under the guise of doing equity, each of the lawsuits against the customers and other remote recipients of funds seek to invalidate profits shown in the accounts over the lifetime of the investments and to recover withdrawals made within six years of the filing of the SEC action against BLMIS in the District Court.  Although certain defenses to these lawsuits may vary based on the length of the investment, the type of account, and similar factors, other defenses, such as the safe harbor of section 546(e) of the Bankruptcy Code and payments in satisfaction of an antecedent debt established by securities laws, are applicable to all the cases.  Because these defenses require substantial consideration of non-bankruptcy federal law, including the Securities Investor Protection Act ("SIPA"), mandatory withdrawal of the reference of these cases for the resolution of those issues is required.

The Defendants also contend that withdrawal of the reference is also necessary for substantial consideration of both SIPA and bankruptcy law to determine whether the Trustee has the statutory authority in the first instance to bring these actions.  As shown below, based

upon a preliminary review of the provisions of SIPA, the legislative history of the statute, and decisions interpreting various provision, it is apparent that the Trustee's avoidance actions against innocent customers of BLMIS under sections of the Bankruptcy Code to recover what the Trustee repeatedly calls "other peoples' money" are unauthorized by SIPA, out of keeping with the main purpose of SIPA, which is the protection of customers, and unprecedented in SIPA liquidation proceedings.   Resolution of this threshold issue requires substantial consideration of the SIPA provisions before this Court.

Furthermore, based on the Supreme Court's recent decision *Stern v. Marshall*, 131 S.Ct.2594 (2011), withdrawal of the reference of the adversary proceeding in its entirety is necessary because the Bankruptcy Court lacks Constitutional authority to enter a final order on the Trustee's avoidance claims.  In *Stern,* the Supreme Court determined that although the Bankruptcy Code provides express statutory authority to enter a final order in certain core matters, the grant of such authority "when the suit is made of 'the stuff of the traditional action at common law tried by the courts at Westminster in 1789' and is within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Id*. at 2609 quoting *Northern Pipeline Constr. Co v. Marathon Pipeline Co*., 458 U.S.50, 90 (1982).  Fraudulent conveyance lawsuits, according to the Court, are such common law suits.   They are "quintessentially suits at common law that more clearly resemble state law contract claims brought by the bankrupt estate to augment the bankruptcy estate than they do than they do creditors' hierarchically ordered claims to a *pro rata* share of the bankruptcy res." *Id*. quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989). Straightforward application of the *Stern* decision requires withdrawal of the avoidance actions in this complaint to an Article III court.

Each of these issues, more fully discussed below, requires for its resolution, substantial and material consideration of non-bankruptcy federal law.  Accordingly, Defendants request that this Court withdraw the reference of the adversary proceeding.

## FACTUAL BACKGROUND

On December 11, 2008, an action was commenced against BLMIS by the Securities and Exchange Commission ("SEC") in the United States District Court for the Southern District of New York.  On December 15, 2008, a liquidation proceeding was commenced by the Securities Investor Protection Corporation ("SIPC") pursuant to the SIPA.  Irving Picard was appointed Trustee, charged, *inter alia*, with overseeing the liquidation of BLMIS and processing customer claims for money pursuant to SIPA.

The Defendants submitted a customer claim[1] for the "net equity" in the BLMIS account based on the final BLMIS statement consistent with SIPC's advice and the SIPA definition.  The Trustee, applying the cash in/cash out method, somewhat incorrectly, disallowed the claim.  As a result, the Defendants were denied a recovery on lost securities.  The complaint seeks to avoid a preferential transfer and holds in abeyance an otherwise allowable claim..  The complaint names the managing member of this private limited liability company.  However, there is no basis for naming the managing member, individually or as managing member.  Although certain of the avoidance actions seek disallowance of claims or hold claims from positive net equity accounts hostage to the Trustee's avoidance claims against other accounts, the adversary proceedings cannot be deemed claims allowance proceedings.

The adversary proceedings were purportedly brought pursuant to both SIPA, sections 78fff(b), 78fff-1(a), and 78fff-2(c)(3) and the Bankruptcy Code, sections 105(a), 544, 548, 550(a)

---

[1] The customer claim is not a proof of claim.  It is not filed with the bankruptcy court or adjudicated under the claims procedures of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

and 551.  The complaints incorporate the provisions of the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law §270 *et seq.* ("DCL") pursuant to section 544 of the Bankruptcy Code.  The Defendants' time to answer or otherwise respond has not yet expired.

Both the Trustee and the SIPC, the entity operating under the oversight of the SEC, argue that, under SIPA, the Trustee may avoid transfers by brokers to customers that were protected by the securities laws if the broker is ultimately liquidated as a result of a massive fraud or a Ponzi scheme.   To that end, the Trustee imported avoidance actions from a traditional Ponzi scheme and relies upon bankruptcy law involving those cases.  However, the Trustee cannot use SIPA to assert avoidance claims against admittedly innocent, non-insider customers because, among other things, SIPA places limitations on the Trustee's power to avoid these ordinary course securities transactions

## I.     WITHDRAWAL OF THE REFERENCE OF THESE CASES IS MANDATORY

Withdrawal of the reference is governed by section 157(d) of Title 28 of the United States Code, which  provides:

> "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

Pursuant to 28 U.S.C. § 157(d), this Court may *sua sponte* withdraw the reference for "a wide variety of reasons." *Picard v. HSBC Bank PLC*, 11 Civ. 763 (JSR), 2011 U.S. Dist. LEXIS 44126, at *6 (S.D.N.Y. Apr. 25, 2011). The nature of the questions raised by SIPC and the Trustee, and their application to the BLMIS case generally, constitute such reasons.  *See, e.g.*, *In re Chateaugay Corp.*, 86 B.R. 33, 36-39 (S.D.N.Y. 1987) (finding mandatory and permissive withdrawal of core bankruptcy claims appropriate because claims involved

significant issues of first impression of bankruptcy and ERISA law that could impact many present and future retirees and their employers).

### A.     There is Ample Precedent For Withdrawal of the Reference of This Case

Withdrawal of the bankruptcy reference is mandatory "where the movant shows that, absent the withdrawal, the bankruptcy judge would be obliged 'to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statute.'" *HSBC*, 2011 U.S. Dist. LEXIS 44126, at *6-7 (citing *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991)); *see also Picard v. JP Morgan Chase & Co.*, 11 Civ. 0913, 2011 U.S. Dist. LEXIS 57645, *8 (S.D.N.Y. May 23, 2011) (same); *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*, No. 04 Civ. 8177, 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (providing that the reference of any proceeding that involves "substantial and material consideration" of non-bankruptcy federal law must also be withdrawn) (quoting *Shugrue v. Air Line Pilots Ass'n Int'l*, 922 F.2d 984, 995 (2d Cir. 1990)).

Because SIPA is codified under Title 15 as a securities law, a "substantial issue under SIPA is therefore, almost by definition, an issue 'the resolution of [which] requires consideration of both title 11 and other laws of the United States.'" *HSBC*, 2011 U.S. Dist. LEXIS 44126, at *9 (quoting 28 U.S.C. § 157(d)).

Further, where there appears to be a conflict between the Bankruptcy Code and other federal laws, withdrawal is mandatory. *See HSBC*, 2011 U.S. Dist. LEXIS 44126, at *17 (deeming a conflict between SIPA and bankruptcy law as "something that itself warrants withdrawal of the bankruptcy reference"); *see also  Bear, Stearns Sec. Corp. v. Gredd*, No. 01 CIV 4379, 2001 WL 840187, at *2-4 (S.D.N.Y. July 25, 2001)(withdrawing reference where federal securities laws "arguably conflict[ed]" with the Bankruptcy Code).

Withdrawal of the reference is appropriate when issues of first impression are involved. "Where matters of first impression are concerned, the burden of establishing a right to mandatory withdrawal is more easily met." *Picard v. JP Morgan Chase & Co.*, 11 Civ. 0913, 2011 U.S. Dist. LEXIS 57645, at *8-9.

A number of courts in this jurisdiction have withdrawn the reference of proceedings that involved what would normally be considered run-of-the-mill bankruptcy matters, even contract rejection and sales, when other federal laws were substantially impacted. *See In re Boston Generating, LLC*, 10 Civ. 6528 (DLC), 10 Civ. 7208 (DLC), 2010 U.S. Dist. LEXIS 116073 (S.D.N.Y. Nov. 1, 2010) (matters within the bankruptcy court core jurisdiction must be withdrawn if they require the bankruptcy court to interpret federal statutes that affect interstate commerce.)

Finally, withdrawal of the reference under section 157(d) is mandated when resolution of a matter involves substantial consideration of Constitutional issues and bankruptcy law. *See e.g. American Freight Sys. v. ICC (In re American Freight Sys.),* 150 B.R. 790 (D. Kan. 1993) (withdrawing reference on the grounds that creditor action required consideration of constitutionality of ICC regulations, Fifth Amendment due process, *ex post facto* laws and sections 105 and 1142 of the Bankruptcy Code in the context of a confirmed plan.)

Resolution of this adversary proceeding requires application of non-bankruptcy federal law and requires withdrawal of the reference.

**B.      Withdrawal Of The Reference Is Necessary The Bankruptcy Court Lacks Constitutional Authority To Render A Final Decision In The Adversary Proceedings**

Withdrawal of the reference of the entire adversary proceeding is necessary in this case based on a straightforward reading of the Supreme Court most recent ruling on bankruptcy court jurisdiction. In June 2011, the Supreme Court decided *Stern v. Marshall*, 131 S.Ct. 2594 (2011) The Court held that, regardless of the authority given by Bankruptcy Code, bankruptcy courts lack

the constitutional authority to enter a final judgment on common-law claims (including fraudulent conveyance claims) where, as in this case, the claims have been brought solely to augment the bankruptcy case and intertwined in the claims allowance process.  Specifically, the Supreme Court acknowledged that the bankruptcy court had the statutory authority under 28 U.S.C. § 157(b)(2)(C) to enter judgment on a counterclaim that the bankruptcy estate of Vickie Lynn Marshall (a/k/a Anna Nicole Smith) asserted against E. Pierce Marshall's claim for defamation because the Bankruptcy Code defined counterclaims as "core proceedings."  However, the bankruptcy court did not, however, have authority to enter judgment on that counterclaim because Article III reserves to Article III judges the jurisdiction to decide actions "made of 'the stuff of traditional actions of common law tried by the courts at Westminster'"  *Id.*. at 2609 (quoting the Court's decision in *Marathon Pipe Line*, 458 U.S. at 90.)

The Court compared the state law counterclaim brought by Marshall to the fraudulent conveyance action in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) and concluded that both were actions seeking to enforce private rights that were not within the bankruptcy court's constitutional jurisdiction, even though they were defined by the Bankruptcy Code as "core." *Id.* at 2620.

As a constitutional matter, bankruptcy courts may enter a final judgment with respect to counterclaims that (i) involve true "public rights" (matters arising between individuals and the Government in connection with the performance of the constitutional functions of the executive or legislative departments as defined in the Court's decision *Marathon Pipe Line* ) or (ii) are so factually intertwined with the proof of claim that they would necessarily have to be resolved in the claims allowance process.  The Trustee's avoidance claims against the Defendants do not fit into either category.  The avoidance actions are common law claims and the Trustee disallowed the Defendants's customer claim months before the actions were brought.  Accordingly, as this Court

is the only Court authorized to issue a final judgment in avoidance actions, withdrawal of the reference of the adversary proceeding in its entirety is efficient and appropriate.

## II.     THE TRUSTEE'S ACTIONS EXCEED THE LIMITS OF HIS AUTHORITY

The Trustee and SIPC have argued that the fraudulent transfer actions against innocent investors are supported by case law precedent, expressly authorized SIPA particularly §78fff-2(c)(3), and consistent with the legislative history of SIPA.  None of these arguments withstand examination.  Contrary to their assertions, SIPA imposes limitations on the Trustee's powers to bring fraudulent transfer actions against customers.  Moreover, there is no case law precedent for the Trustee's lawsuits to recover legitimate withdrawals from a brokerage account.  Finally, the fraudulent transfer lawsuits are squarely at odds with purpose of SIPA which is to protect customer's legitimate expectations in t heir brokerage accounts.

### A.     The Adversary Proceedings Are Not Consistent With SIPA

First, the application of bankruptcy law is limited by the provisions of SIPA and its underlying policy.  The statute requires that the Trustee's conduct of the SIPA liquidations proceeding in accordance with select provisions of the Bankruptcy Code be consistent with SIPA. 15 U.S.C. §78fff(b) ("**To the extent consistent with the provisions of this chapter**, a liquidation proceeding shall be conducted in accordance with , and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11.") emphasis added.  The same requirement that they be consistent with the provisions of SIPA is imposed on the Trustee's duties by section §78fff-1(b).

The provisions of SIPA are not focused on equality of distribution, but rather on the protection of customers, including a procedure for application for a protective decree by SIPC under §78eee(3)(B), protection of the integrity of individual accounts (§78 fff(a)(1); and the

delivery of securities to customers "to the maximum extent practicable in satisfaction of customer claims for securities of the same class and series of an issuer" (§78fff-1(b)(1)).

In addition, the legislative history, cited below, of the statute makes it clear its purpose was to restore customers' confidence in the securities market not to sue them for legitimate withdrawals :

> Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms.  Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings.  In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with firms that failed.  Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers.  S. Rep. No. 91-1218, pp. 2-4 (1970); H.R. Rep No. 91-1613, pp. 2-4 (1970).

Based on these statutory provisions and the history behind the statute, its hard to imagine that lawsuits against thousands of innocent customers for return of ordinary withdrawals from their accounts is consistent with SIPA, notwithstanding SIPC's support of the lawsuits.

**B.      SIPA Imposes Limits on the Trustee's Avoidance Powers**

Furthermore, SIPA does not authorize the commencement of over a thousand lawsuits to recover "other peoples' money."  It does not expressly authorize fraudulent transfer lawsuits at all.  Section 78fff-1(a) expressly vests the Trustee with the powers to avoid preferences, not fraudulent transfers.  It provides in relevant part:

> A trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11.  15 U.S.C. §78-1(a).

Although the Trustee and SIPC rely on §78fff- 2(c)(3) for the Trustee's authority to bring the fraudulent transfer actions against the Defendants and other customers, the plain words of this section of the statute cannot be read as an invitation to sue customers.  The provision only (a) authorizes the Trustee to use the avoidance provisions to recover property transferred by the debtor

when the customer property is insufficient to satisfy the claims of customers and reimburse SIPC for specific advances and (b) makes it possible for the Trustee to pursue preference actions by clarifying that "a transfer to or for the benefit of a customer" shall be deemed a transfer to or for the benefit of a creditor as required by section 547 of the Bankruptcy Code.  The section states:

> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11. Such recovered property shall be treated as customer property. For purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

15 U.S.C. §78fff-2(c)(3).

Based on the first sentence of the provision, the Trustee's avoidance powers are limited by the amount he collects to satisfy customer claims and restrictions of the Bankruptcy Code provisions.  The second sentence of the section is not an express authorization to sue customers to recover transfers.  It has been interpreted to "create[s] a legal fiction which treats securities as if they were owned by the debtor prior to transfer; and, if the transfer was for the benefit of the customer, treats the customer as if it were a creditor." *In re Bevill, Bresler & Schulman, Inc.*, 94 B.R. 817, 825 (D.N.J. 1989).  The purpose of this fiction is to "enable the trustee to fit the transfer into the provisions of the avoidance sections of the Code." *Id.  See also Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 321 (S.D. Tex. 1999).  The avoidance section that the phrase "to or for the benefit of a creditor" is meant to fit is the preference section 547(b)(1), not a fraudulent transfer

claim.[2]  The preference section authorizes t he avoidance of a transfer "to or for the benefit of a creditor" if the trustee meets the other requirements and subject to certain defenses.

The purpose behind granting the SIPC trustee avoidance powers was apparently primarily to prevent the proverbial "race to the courthouse" triggered by the filing of an action by the SEC based upon the financial difficulties of a broker dealer prior to the filing of a liquidation proceeding brought by SIPC.  *See Hill v. Spencer S&L Ass'n,* 83 B.R. 880, 888 (D.N.J. 1988).  In that case, the court authorized the avoidance of post-petition transfers made by the customers after the filing of an SEC action, but before the commencement of the liquidation under SIPC.  The repeated references to preferences in the statute and the concern about a gap period when the news of a broker's instability was out, it appears that a SIPA trustee's avoidance power was intended to respond to that narrow concern.

The Defendants' payment within the preference period was not a rush on BLMIS on the brink of its collapse. It was an ordinary securities transaction protected under section 546(e).

### C.    There Is No Precedent for The Trustee's Actions Against Innocent Customers

The fact that there is no precedent under SIPC for this widespread assault on customers of BLMIS in the history of SIPC is a good indication that the Trustee and SIPC are exceeding the authority of SIPA in this case.

SIPC, citing only to *Picard v. Taylor (In re Park S. Sec., LLC),* 326 B.R. 505 (Bankr. S.D.N.Y. 2005) and *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406 (S.D.N.Y. 2001), asserts that a SIPA trustee's ability to sue customers for fraudulent is "widely recognized."  SIPC Mem., p.17.  These cases are easily distinguished.  In *Picard v. Taylor,* the trustee sought to avoid transfers that were directly traceable from a few specified accounts to the

---

[2] If a customer is a creditor, the withdrawal of funds from his account satisfies an antecedent debt for fraudulent transfer law.

account of one customer.  In that regard, it more closely resembles the classic fraudulent transfer (although the customer was unaware of the transfer) than the readjusting of thousands of accounts based on an imported notion of equitable distribution.  *Jackson v. Mishkin* involves the avoidance of stock trades made within weeks of the filing of a SIPA action primarily to friends and family members of certain brokers for the purpose of disallowing claims, not recovering legitimate withdrawals made by customers from their accounts for decades.

The only authority for the Trustee's avoidance actions to recover fictitious profits are cases that were not SIPA liquidations, such as *In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010) and *In re Dreier LLP*, 452 B.R. 391 (Bankr. S.D.N.Y. 2011).  The *Bayou* case involved a fraud perpetrated by the manager of limited liability fund to cover investment losses from its members. *Dreier* involved a scheme to issue and sell fictitious promissory notes purportedly issued by companies in U.S. and Canada.  None of the statutory limitations under SIPA applied in those cases.

In sum, there is no statutory authority for the Trustee's avoidance actions.

## III.   INTERPRETATION OF SIPA AND OTHER SECURITIES LAWS IS NECESSARY TO DETERMINE THAT WITHDRAWALS DISCHARGED ANTECEDENT DEBT FROM A BROKER TO ITS CUSTOMERS

The applicable fraudulent conveyance statutes make it clear that a transfer that discharges a valid debt--such as the transfers  BLMIS made to its innocent customers --can not be avoided as fraudulent.  Section 548(c) of the Bankruptcy Code allows a transferee that takes for value and in good faith to retain any interest transferred.   "Value" means "satisfaction…of a present or antecedent debt of the debtor…." 11 U.S.C. 548(d)(2)(A). Similarly, the DCL provides:

§ 272. Fair consideration. Fair consideration is given for property, or obligation, .

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or **an antecedent debt is satisfied.** (emphasis added)

Avoidance of a payment on an antecedent debt is inconsistent with the purpose of fraudulent transfer law even if the payment allows one creditor to receive more than another. "[T]he preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because 'the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them.'" *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (quoting *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987)); *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) ("'[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.'" (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D. 2d 86, 90-91, 599 N.Y.S. 2d 816 (1st Dep't 1993))).  .

The transfers to the BLMIS customers were on account of an antecedent debt as evidenced by their confirmations and account statements.  Investment securities today are held in electronic form.  The certificate is not actually given to the holder.  Instead, the holder is given a confirmation and the information regarding the security is held electronically.   The only evidence of ownership a customer is likely to receive is the acknowledgement by the broker, in a confirmation or periodic statement, that it owes securities to the customer.  It is therefore a bedrock principle of federal broker-dealer regulation that brokers must issue statements, upon which customers may rely, to evidence customer transactions and holdings. Rule 10b-10 under the Securities Exchange Act of 1934 requires brokers to provide customers with confirmations of securities transactions. *See* Rule 10b-10, 17 C.F.R. § 240.10b-10 (2010)

(Confirmation of Transactions).[3]  The SEC releases adopting this rule reflect that these confirmations are to serve as legally enforceable evidence of a broker's obligation to the customer.[4]

The rules of the Financial Industry Regulatory Authority ("FINRA") and the New York Stock Exchange ("NYSE") similarly mandate issuance of periodic account statements. *See* NASD Rule 2340 (Customer Account Statements); NYSE Rule 409 (Statements of Accounts to Customers).  Because statements are so critical, where customers have given their broker trading authority, the SEC prohibits waiver of the right to receive such statements.  *See* Confirmation of Transactions, 59 Fed. Reg. 59,612, 59,614 ("The customer may not waive this periodic report.").

The plain language of the Bankruptcy Code and state law equating value with the payment on an antecedent debt should apply in this case as a complete defense to the avoidance actions.  Customers had a valid, enforceable right to the payment in their accounts notwithstanding the fact that Madoff was operating fraudulently at some point in the history of BLMIS.  Courts have recognized that such a payment from a debtor on a debt, created by contract, should be considered receipt of value by the debtor.  *See In re Carrozella & Richardson*, 286 B.R. 480 (Bankr. D. Conn. 2010)(payment on contract obligations constituted reasonably equivalent value); *Lustig v. Weisz & Assocs. (In re Unified*

---

[3] SEC regulations have the force of law, and cases that involve substantial consideration of such regulations also require withdrawal of the reference to the Bankruptcy Court. *See, e.g., Gredd*, 2001 WL 840187, at *4 (withdrawing reference because the Trustee's fraudulent transfer theory required "substantial and material consideration" of federal securities regulations); *In re Contemporary Lithographers, Inc.*, 127 B.R. 122, 123 (M.D.N.C. 1991) (granting motion to withdraw the reference because case required interpretation of SEC regulations).

[4] *See* Confirmation of Transactions, 59 Fed. Reg. 59,612, 59,613 (Nov. 17, 1994) (to be codified at 17 C.F.R. pt. 240) ("For over 50 years, the customer confirmation has served basic investor protection functions by conveying information allowing investors to verify the terms of their transactions; alerting investors to potential conflicts of interest with their broker-dealers; acting as a safeguard against fraud; and providing investors the means to evaluate the costs of their transactions and the quality of their broker-dealer's execution.").

*Commercial Capital*), 2002 WL 32500567,*8 (W.D.N.Y. June 21, 2002).  In this case, the Defendants by virtue of securities laws and their agreements with the brokers were entitled to payments against the balances shown in their accounts.

The Trustee and SIPC have argued that the transfers to the BLMIS customers were not on account of an antecedent debt as evidenced by their confirmations and account statements based on the Second Circuit's recent decision upholding the Trustee's method of determining a customer's net equity for purposes of allowance of their claims.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 10-2378, 2011 U.S. App. LEXIS 16884 (2d Cir. Aug. 16, 2011).  Notwithstanding the Trustee and SIPC's effort to give the ruling broad implications extending to the avoidance actions, the Second Circuit decision has no bearing on what constitutes an "antecedent debt" for purposes of state and federal fraudulent transfer actions.

The Defendants filed a customer claim based upon the last statement and reasonably expected a $500,000.00 advance from SIPC and a claim against the customer fund.  The Trustee denied the claims.  The Second Circuit's decision affirms the Trustee's denial of the claims and goes no further.   The Second Circuit decision is not a ruling that the confirmations or periodic statements, mandated by federal securities law to evidence what the broker owes the customer before the commencement of the SIPA liquidation are not valid to establish a debt owed by the broker before the proceeding was commenced.

## IV.    CONSIDERATION OF SECTION 546(E) OF THE BANKRUPTCY CODE AND SIPC REQUIRES WITHDRAWAL OF THE REFERENCE

Recognizing that if safe harbor of section 546(e) applies in these cases, the Trustee will not prevail in many of his actions against innocent customers, including preference and constructive fraudulent transfer claims, the Trustee argues that withdrawal of the reference is not mandated in these cases because section 546(e) is not applicable in Ponzi-scheme cases; the purpose of section 546(e) is not served in a case where no securities transactions occurred;

and a defense to an avoidance action under section 546(e) does not merit withdrawal of the reference.

The argument that a valid law should not apply in a fraud case makes little sense when the law itself specifically excludes actual fraud from protections the law provides.  Section 546(e), by its terms, excludes transfers made with intent to hinder, delay and defraud creditors avoidable under section 548(a)(1)(A) from the safe harbor.  Thus, the transfers to alleged insiders, who received the special benefits of the fraud, would be excluded from the safe harbor of section 546(e).  Consequently, the application of section 546(e)'s safe harbor to the settlement transactions of the innocent investors would not validate the fraud or insulate the early architects of the fraud from liability.

The Trustee and SIPC's other arguments against the section 546(e) defense should be put to rest by the Second Circuit's recent decision, *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, Case No. 09-5122, 2011 U.S. App. LEXIS 13177 (2d Cir. June 28, 2011).  That case, applying section 546(e) based on the plain language of the statute, makes it clear that the safe harbor of section 546(e) is broad in scope and is not limited to those transactions involving the buying and selling of securities in the market.  The Second Circuit recognized that section 546(e) itself "stands 'at the intersection of two important national legislative policies on a collision course--the policies of the bankruptcy  and securities law.'" *Id*. at *14 quoting *In re Resorts Intern., Inc*., 181 F.3d 505, 515  (3rd Cir. 1999).  Finally, it should be noted that section 546(e) was raised in defense to a fraudulent transfer action in the context of a major fraud.  The Second Circuit was clearly aware of Enron's history of fraud and the posture of the case in affording a safeguard in the case of the private redemption of securities. Thus, the Trustee's contention that section 546(e) is not applicable because Madoff was involved in a fraud and purportedly did not actually buy or sell any customer securities is irrelevant to a determination

of whether payments to customers, made as liquidations of their securities positions, constitute "settlement payments."

## CONCLUSION

Based upon the above, Defendants respectfully requests that this Court withdraw the reference of these adversary proceedings.

Dated: October 27, 2011
      New York, New York

SNR DENTON US LLP
By:   */s/ Carole Neville*
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Tel:  (212) 768-6700
Fax: (212) 768-6800

*Attorneys for Defendants*